785 A.2d 913

HARLEYSVILLE INSURANCE COMPANIES, PLAINTIFF–APPEL-
  LANT, v. DAVID GARITTA, STEPHEN GARITTA AND JOSEPH
  LICATA, DEFENDANTS, AND ALBERT C. SABATELLI, III,
  ADMINISTRATOR AD PROSEQUENDUM AND GENERAL AD-
  MINISTRATOR OF THE ESTATE OF ALBERT C. SABATELLI,
  IV, DECEASED, MILDRED M. RAFFERTY AND KRISTY MA-
  RIE FERRIZZI, DEFENDANTS–RESPONDENTS.

Argued September 17, 2001—Decided December 17, 2001.

*Betsy G. Liebman* argued the cause for appellant (*Capehart & Scatchard*, attorneys).

*James F. Zaccaria* argued the cause for respondents (*Morrison & Trimble*, attorneys; *William E. Reynolds*, on the letter in lieu of brief).

The opinion of the Court was delivered by

VERNIERO, J.

This is a declaratory judgment action. Plaintiff insurer seeks a declaration that the homeowner's policy purchased by the insured does not provide liability coverage for certain conduct of the insured's son, also an insured person under the policy. Specifically, the son stabbed a third party during an altercation on the insured premises, and the victim died. The trial court granted summary judgment in favor of the insurer, concluding that the son's actions fell within the policy's provision excluding coverage for " 'bodily injury' ... [w]hich is expected or intended by the 'insured'[.]" The Appellate Division disagreed. The panel concluded that the circumstances of the stabbing, together with the son's intent or expectation in wielding the knife that killed the

victim, are sufficiently unclear that a trial is warranted. We agree with the trial court and reverse.

## I.

We consider the facts in a light most favorable to the non-moving parties. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). On September 15, 1996, David Garitta and five of his friends were socializing at David's father's house in Greentown, Pennsylvania. Joseph Licata was among those gathered with David. At approximately 1:15 a.m., Albert Sabatelli arrived at the house unexpectedly. David and Albert had been friends, and Albert's mother, Mildred Rafferty, was the girlfriend of David's father. David, however, did not approve of his father's relationship with Rafferty. To express that disapproval in the preceding week, David had taken Rafferty's clothing and some personal effects from his father's house and had placed them in a bag on the porch. When Rafferty arrived the day after David had removed her belongings, he refused to let her enter the house.

Unbeknownst to David, his actions in respect of Albert's mother had infuriated Albert, who came to the Garitta house to confront him. According to David, Albert immediately began assaulting him. Albert pushed David, then grabbed his arm and took him into one of the bedrooms. David stated that Albert "was throwing me pretty hard against the wall." During the assault Albert cried out to David, "You're not respecting my mother, you owe her an apology." According to David's version of events, he did not want a physical confrontation and informed Albert that he did not want to fight.

The fight eventually spilled over into another room and Albert placed David in a choke hold. Albert then cocked his fist to punch David. When asked if he had been frightened by those actions, David testified that he was "terrified." At that juncture two of David's friends interceded, telling David and Albert that they should take their fight "outside." Albert responded, "Come on I'll take you outside, I'll fight you outside . . . let's finish this outside."

David also quoted Albert as saying, "Remember, no cops no matter how bad I hurt you." Albert stated, "Okay, I'm going outside," and then he proceeded outside to the deck.

David testified that he believed that he had no choice but to go outside and confront Albert. He then went to his bedroom to put on his sneakers. When asked what he was planning to do next, David responded, "Going outside to get beat up. Maybe try to talk him out of it. Just, I didn't want to fight. I was thinking I didn't know why I was fighting in the first place."

David also explained that his intention was to "[j]ust go [ ] outside ... [because] [i]f I didn't go outside he would've [come] back inside." David testified that he did not try to lock the door after Albert went outside because the door to the deck was glass. He feared that Albert would try to break the glass door if he attempted to lock him out. David also expressed his view that Albert was the bigger and stronger of the two men.

Albert stood outside the house, allegedly shouting vulgarities at David. As David walked toward the end of the hallway, Joseph Licata handed him a knife that Licata had removed from the kitchen. We note, however, that in one of his early statements to the authorities, as reflected in the police reports prepared after the incident, David indicated that "he put on his sneakers and was walking out when he saw the fillet knife on the breakfast table." He told the police that he "picked up the knife[,] took it out of its sheath[,] and then walked out the door." He later clarified those comments by indicating that he "was given the knife by [Licata]" and that Licata "told him [what] to do with [the] knife." For purposes of this appeal, we accept David's assertion that Licata handed him the knife.

After giving him the knife, Licata purportedly stated to David, "[D]o what you gotta do.... Cut him like we do in New Jersey." David then put the knife in the back of his pants and went onto the deck. According to David, Albert was waiting for him and came towards him. David also testified, "I just got really scared and I took the knife behind my back and I stabbed him."

David stabbed Albert twice, puncturing his heart and stomach. He acknowledged that Albert was unarmed. The record indicates that Albert had removed his shirt prior to moving onto the deck. Albert's bare chest and stomach presumably enhanced the ability of the knife to puncture the victim's flesh, thus intensifying his injuries. David also acknowledged that he did not ask Albert to leave the property, nor did he tell Albert that he had a knife or warn him that he would cut him if Albert approached.

David stated that Albert "didn't give me a chance, he just came right at me," and that the victim's hands were "clenched." David indicated that he was more terrified at that juncture than he had been earlier. When asked whether he went onto the deck with the intention of killing the victim, David responded, "No." He testified that rather than wanting to hurt or stab Albert, he had hoped to persuade him to leave the premises. David repeated several times that he was "really scared" and "terrified."

David further indicated that he was not aiming to stab Albert in "a vital part of his body," and that the two thrusts were close in time, "[o]ne right after the other, like really fast[.]" He indicated that he knew he had cut Albert but did not know that he had inflicted a knife wound to the victim's heart. David purportedly told Albert to go to the hospital. David then walked back into the house, washed the knife, and put it back in the kitchen. David claimed that only then, when one of his friends screamed, did he notice that Albert had collapsed and was injured seriously. David testified that he attempted to administer CPR to Albert and said to him, "I didn't mean for this to happen." A short time later, Albert was pronounced dead at the scene.

As a result of the altercation, Pennsylvania law enforcement authorities charged David with criminal homicide. Under the statutes in that jurisdiction, "[a] person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being." 18 *Pa. Cons. Stat. Ann.* § 2501(a) (1998). Criminal homicide, in turn, is classified as "murder, voluntary manslaughter, or involuntary manslaughter."

*Id.* at § 2501(b). In March 1997, David pled guilty to third degree murder (a degree of murder not recognized in New Jersey) and was sentenced to five years in prison.

The authorities also filed criminal charges against Joseph Licata, who had given David the knife used in killing the victim. Those charges were tried. Although the record does not indicate the results of that trial, at the time of the filing of this action Licata was serving a prison sentence presumably arising out of the incident. (Much of the factual recitation contained in this opinion is derived from testimony at the Licata trial.)

In September 1998, Albert's father, as administrator of his son's estate, filed a wrongful death action in the Law Division against David, David's father, and Joseph Licata. Mildred Rafferty, Albert's mother, and Kristy Marie Ferrizzi, the mother of Albert's child and his fiancee at the time of the incident, are also plaintiffs. The complaint alleges that David and Licata "instigated" the altercation in which Albert "was attacked and assaulted." The complaint also alleges that

[t]he recklessness, negligence and carelessness of the defendant, David Garitta, consisted of his use of a weapon without due regard to the dangerousness of said weapon or concern for the potential consequences of the use of said weapon, and his failure to recognize the danger presented by the introduction of said weapon into the altercation.

Plaintiffs seek compensatory and punitive damages.

Shortly after the filing of that complaint, Harleysville Insurance Companies (Harleysville) filed this action, seeking a declaration that the homeowner's policy it issued to David's father, which also covers David as a member of his father's household, provided no coverage to David for the injuries or death of Albert. The insurer named two groups of defendants in that action: (1) Albert's father and the other family members who are plaintiffs in the wrongful death action (defendants), and (2) David, David's father (the two insureds), and Joseph Licata.

The policy at issue provides liability coverage for "bodily injury" caused by an "occurrence" for which the insured is responsible. The policy defines an "occurrence" as "an accident, including

continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in ... '[b]odily injury'[.]" The policy defines "bodily injury" to mean "bodily harm, sickness or disease, including required care, loss of services and death that results."

At the heart of this appeal is the policy's provision that states that the insurer will not provide coverage for bodily injury "[w]hich is expected or intended by the 'insured'[.]" Based on that exclusion, the insurer asserts that it is not obligated to provide coverage to David for the wrongful death of Albert or to undertake the defense of that action on David's behalf. (Although the altercation took place in Pennsylvania, plaintiffs filed their wrongful death complaint in New Jersey because two of the named defendants in that suit reside in this jurisdiction. Hence, the insurer commenced its declaratory judgment action here as well.)

The parties in Harleysville's action filed respective motions for summary judgment. In December 1999, the trial court granted the insurer's motion, concluding that the act of stabbing Albert itself demonstrated that David intended to cause him bodily injury within the meaning of the policy. The trial court stated:

> I find that when you intend—when you stab someone, you intend to harm them. And when you stab them twice[,] not once[,] you intend to kill them.... I think the intent is there and it can be gleaned from the actions taken. Not one stab[,] but two stabs[,] and, therefore, I find there's no coverage under the Harleysville policy.

Based on that same rationale, the trial court also determined that the insurer had no obligation to undertake the defense of the wrongful death action on David's behalf.

In an unreported opinion, the Appellate Division reversed. While expressing its view that "this is a close case[,]" the panel held that summary judgment was an improper disposition on the record presented. More specifically, the panel concluded that "a trial is required to determine what took place on the evening in question, how [Albert's] wounds were inflicted, and what David's intentions and expectations were in using the knife given [to] him

by Licata." We granted the insurer's petition for certification, 167 *N.J.* 629, 772 *A.*2d 931 (2001), and now reverse.

## II.

We note at the outset two well-established tenets that serve as a backdrop to our decision. First, "the words of an insurance policy are to be given their plain, ordinary meaning. 'In the absence of any ambiguity, courts should not write for the insured a better policy of insurance than the one purchased.'" *Zacarias v. Allstate Ins. Co.,* 168 *N.J.* 590, 595, 775 *A.*2d 1262 (2001) (quoting *Gibson v. Callaghan,* 158 *N.J.* 662, 670, 730 *A.*2d 1278 (1999)). Second, "[p]olicy provisions that exclude coverage resulting from intentional wrongful acts are 'common,' are 'accepted as valid limitations,' and are consistent with public policy." *Allstate Ins. Co. v. Malec,* 104 *N.J.* 1, 6, 514 *A.*2d 832 (1986) (citing *Ruvolo v. Am. Cas. Co.,* 39 *N.J.* 490, 496, 189 *A.*2d 204 (1963)).

Within that broad framework, disposition of this appeal turns largely on the application of the principles articulated in *SL Industries, Inc. v. American Motorists Insurance Co.,* 128 *N.J.* 188, 607 *A.*2d 1266 (1992), and *Prudential Property & Casualty Insurance Co. v. Karlinski,* 251 *N.J.Super.* 457, 598 *A.*2d 918 (App.Div.1991). In *Karlinski,* the insured's minor son, James, Jr. (also a named insured), had participated in a "pre-arranged voluntary physical confrontation" with another young man, Mark, in which Mark suffered a fractured hip. *Karlinski, supra,* 251 *N.J.Super.* at 459, 461, 598 *A.*2d 918. The insured's homeowner's policy contained a provision excluding coverage for "'bodily injury ... which is expected or intended by the insured.'" *Id.* at 459, 460, 598 *A.*2d 918. Based on that exclusion, the insurer sought a declaration that it was not required to defend or indemnify James, Jr. in respect of Mark's injuries. *Id.* at 459, 598 *A.*2d 918.

The trial court granted summary judgment in favor of the insurer, concluding that James, Jr. had "instigated the fight and threw the first blow and started the fight." *Id.* at 460, 598 *A.*2d 918. The trial court based its decision on its reading of deposi-

tions and other information obtained through discovery. *Ibid.* The court further concluded: "As far as I am concerned, it is intentional conduct and the coverage doesn't apply." *Ibid.*

The Appellate Division reversed. Surveying the case law, the panel observed that "it is difficult to ascertain a clear weight of authority on the subject of liability insurance coverage for unintended results of intentional acts." *Id.* at 464, 598 *A.*2d 918. With that observation in mind, the court adopted the following standard:

> [W]hen a coverage exclusion is expressed in terms of bodily injury expected or intended by the insured, and where the intentional act does not have an inherent probability of causing the degree of injury actually inflicted, a factual inquiry into actual intent of the actor to cause the injury is necessary.
>
> [*Ibid.*]

Based on that standard, the panel determined that a factual dispute existed regarding "whether Mark's broken hip was expected or intended by James, Jr." *Id.* at 465, 598 *A.*2d 918. Thus, a trial was necessary. In so concluding, the court also observed "that young teenagers today, no less than their forebearers, are prone to engage in mutually accepted tests of dominance and prowess, involving physical contact. These may take the form of ... king-of-the-hill assaults ... in which, physicality notwithstanding, there is no intent to cause more than passing discomfort." *Id.* at 465 n. 3, 598 *A.*2d 918.

This Court adopted the *Karlinski* standard in *SL Industries, supra,* 128 *N.J.* at 212, 607 *A.*2d 1266. In *SL Industries,* an employee had filed an employment discrimination suit against his employer, asserting age discrimination and common-law fraud arising out of the employer's elimination of the employee's position. *Id.* at 194, 607 *A.*2d 1266. The employee alleged that he had suffered bodily and personal injury as manifested by "loss of sleep, loss of self-esteem, humiliation and irritability." *Id.* at 195, 607 *A.*2d 1266. The employer settled the suit and then sought a declaration that its insurer was obligated to indemnify it for the settlement. *Id.* at 195–96, 607 *A.*2d 1266.

The policy required the insurer to indemnify and defend the employer for all damages resulting from "bodily injury" caused by an "occurrence." *Id.* at 194, 607 *A.*2d 1266. The policy defined "occurrence" to mean an " 'accident ... which results in bodily injury ... neither expected nor intended from the standpoint of the insured.' " *Ibid.* The trial court granted summary judgment in favor of the insurer. *Id.* at 196, 607 *A.*2d 1266. The Appellate Division reversed, remanding the case to the Law Division for determination of whether the employee's asserted emotional distress was intended or unexpected by the employer. *Id.* at 196–97, 607 *A.*2d 1266.

In affirming the Appellate Division's judgment, this Court disposed of a number of issues, only one of which is relevant here. Specifically, we addressed "whether *any* intent to injure [on the part of the insured] will render the resulting injury intentional, whether the wrongdoer must intend the *specific* injury that results, or whether there is some middle ground between the two approaches." *Id.* at 209, 607 *A.*2d 1266. Reviewing the same competing authorities considered by the *Karlinski* court, we concluded that that court had adopted the appropriate standard.

We explained:

[T]he [*Karlinski*] court held that under normal circumstances, when the result of an action conforms to that which one would predict, the demonstration of a subjective intent to injure is sufficient to preclude coverage without further inquiry into the intent to cause the actual injury that resulted. However, in those circumstances in which the facts indicate that the acts in which the insured engaged were unlikely to result in the degree or type of injury that in fact occurred, an inquiry into the subjective intent to cause the resulting injury is in order.

. . . .

We believe the *Karlinski* test presents the most reasonable approach. It conforms to an insured's objectively-reasonable expectations and provides the victim with the greatest possibility of additional compensation consistent with the goal of deterring intentional wrongdoing. Assuming the wrongdoer subjectively intends or expects to cause some sort of injury, that intent will generally preclude coverage. If there is evidence that the extent of the injuries was improbable, however, then the court must inquire as to whether the insured subjectively intended or expected to cause that injury. Lacking that intent, the injury [is] "accidental" and coverage will be provided.

[*Id.* at 210, 212, 607 *A.*2d 1266.]

On the same day we issued our opinion in *SL Industries*, this Court also decided *Voorhees v. Preferred Mutual Insurance Co.*, 128 *N.J.* 165, 607 *A.*2d 1255 (1992). The insurance clause at issue in *Voorhees* excluded coverage for " 'liability . . . caused intentionally.' " *Id.* at 171, 607 *A.*2d 1255. In discussing how courts should approach such provisions, we observed: "The key issue is whether the court must find a subjective intent to injure, or whether it can presume an intent to injure from the objective circumstances." *Id.* at 184, 607 *A.*2d 1255. In the underlying suit, a teacher alleged wrongful conduct against a parent (the insured), who had purportedly damaged the teacher's reputation and caused her emotional distress accompanied by certain physical symptoms. *Id.* at 169–71, 607 *A.*2d 1255.

In affirming the Appellate Division's determination that summary judgment in favor of the insurer was not appropriate, the Court reiterated that the "general trend" in the case law "requir[ed] an inquiry into the actor's subjective intent to cause injury." *Id.* at 184, 607 *A.*2d 1255. The Court, however, described a narrow but critical departure from that trend:

> When the actions are particularly reprehensible, the intent to injure can be presumed from the act without an inquiry into the actor's subjective intent to injure. That objective approach focuses on the likelihood that an injury will result from an actor's behavior rather than on the wrongdoer's subjective state of mind.
>
> [*Ibid.*]

As a general rule, then, policy exclusions of the type at issue here represent enforceable limitations to an insurance contract when free of ambiguity. Courts ordinarily should refrain from summary judgment in respect of whether an insured intended or expected to cause the actual injury to a third party unless the record undisputedly demonstrates that such injury was an inherently probable consequence of the insured's conduct. In that latter circumstance, a trial may not be necessary to determine the applicability of the exclusion, provided that there has been a sufficient demonstration of the insured's subjective intent to cause some degree of injury. When the insured's conduct is particularly

reprehensible, courts may presume an intent to injure without inquiring into the actor's actual intent.

## III.

█ Applying those tenets, we hold that the trial court correctly granted summary judgment in favor of the insurer. The undisputed facts indicate that David exited the house with a knife hidden in the back of his pants and met Albert, who was unarmed. Shortly before the deadly encounter, Licata had urged David to "[c]ut [Albert] like we do in New Jersey." Without warning, David then thrust the knife into Albert's bare torso, twice. The insured acknowledged those acts, stating that the thrusts were close in time, "[o]ne right after the other[.]"

█ Under those circumstances, a trier of fact need not determine David's actual intent. The insurer has demonstrated that the insured intended to cause some injury, and that the actual injury that led to Albert's death was an inherently probable consequence of the insured's actions. Thus, the trial court properly determined the insured's intention or expectation, within the meaning of the exclusionary clause, as a matter of law. Consistent with *SL Industries* and *Voorhees*, no further factual inquiry is necessary to resolve this dispute.

Courts in other jurisdictions have ruled similarly in analogous contexts. *See, e.g., Econ. Fire & Cas. Ins. Co. v. Meyer,* 427 *N.W.*2d 742, 744–45 (Minn.Ct.App.1988) (affirming summary judgment in favor of insurer when insured used kitchen knife to stab man found in girlfriend's bed, even accepting fact that insured was presented with "provocative situation," because conduct was of such nature that " 'common sense require[d] ... an inference that insured intended ... to injure' ") (internal citation omitted); *Yother v. McCrimmon,* 147 *Mich.App.* 130, 383 *N.W.*2d 126, 128 (1985) (affirming summary judgment in favor of insurer when insured struck victim with tire iron because injury was natural, foreseeable, and "expected" result of insured's actions, notwithstanding insured's claim that he acted solely in self defense); *Hanover Ins.*

*Co. v. Newcomer,* 585 *S.W.*2d 285, 289 (Mo.Ct.App.1979) (affirming declaratory judgment in favor of insurer when insured, while under influence of alcohol and marijuana, swung machete, striking victim in groin and leg).

Defendants urge a contrary conclusion, contending that David's plea arrangement in Pennsylvania evinces that he did not possess the specific intent to kill Albert. Alternatively, they argue that the allegations of "recklessness, negligence and carelessness" contained in the wrongful death complaint trigger a duty on the part of Harleysville to defend that action, irrespective of David's intent. In support of that latter contention, defendants cite a passage from *Voorhees* in which this Court noted that an insurer's duty to defend "is determined by comparing the allegations in the complaint with the language of the policy. When the two correspond, the duty to defend arises, irrespective of the claim's actual merit." *Voorhees, supra,* 128 *N.J.* at 173, 607 *A.*2d 1255.

Although there is some support for defendants' contentions, neither argument is persuasive. First, David's criminal plea, although helpful in putting his actions in context, is not dispositive in respect of whether the policy exclusion applies in this instance. We assume that David's pleading to third degree murder reflected his refusal to admit to intentional wrongdoing. *See* 18 *Pa. Cons. Stat. Ann.* § 2502(c) (1998) (providing that murder in third degree excludes homicides committed by intentional killing). That said, we are not bound by the implications of that criminal plea agreement when determining whether the insureds' policy exclusion should apply in this purely civil context. *Cf. Bittner v. Harleysville Ins. Co.,* 338 *N.J.Super.* 447, 455–57, 769 *A.*2d 1085 (App.Div. 2001) (explaining that some forms of conduct, such as acts of domestic violence, are so reprehensible that public policy compels that wrongdoers be denied insurance coverage, even when they are found to have possessed only reckless mental state).

In so concluding, we adopt the same approach that was used in *State Farm Fire & Casualty Co. v. Gorospe,* 106 *F.Supp.*2d 1028 (D.Haw.2000). In *Gorospe,* the federal district court considered

whether the insured's manslaughter plea established triable issues of fact in respect of whether the insured intended to kill his victim. More specifically, the insured shot the victim six times in the head and body, and he later pled no contest to the charge of manslaughter. *Id.* at 1029. The applicable state statute provided that a "person commits the offense of manslaughter if . . . [h]e recklessly causes the death of another person[.]" *Ibid.* The plaintiff insurer sought a declaration that it was not obligated to indemnify the insured for his criminal acts on the basis of the homeowner's insurance policy's exclusion for bodily injury that was "expected or intended[.]" *Id.* at 1030.

Like defendants here, the defendants in *Gorospe* had argued that the policy's exclusion for intentional acts did not apply because, as reflected in the plea arrangement, the insured "[could] only be said to have killed [the victim] 'recklessly,' not 'intentionally.'" *Id.* at 1033. The district court granted summary judgment in favor of the insurer, concluding:

> Defendants in criminal cases often plead guilty to lesser charges to avoid the risks associated with trial. By the same token, prosecutors are willing to accept pleas to lesser charges to avoid the difficulty, risk, and expense of trial. That [the insured] pled guilty to the lesser crime of manslaughter does not mean that [the insurer] is precluded from arguing that [the insured] expected to inflict [the victim's] injuries. The court is unpersuaded that [the insured's] no contest plea renders the "intentional act" exclusion inapplicable.

> The undisputed evidence in this case demonstrates that [the insured's] shooting of [the victim] resulted in injuries that were, at the very least, "expected." Coverage for expected injuries is clearly excluded under the [applicable policy].

> [*Id.* at 1034.]

We reason similarly in this case. We cannot know why the Pennsylvania prosecutors accepted David's plea to third degree murder, why David considered that plea, or why his friend, Licata, refused to plead at all. Those questions, however, do not control the analysis. Notwithstanding the plea, we are convinced that the undisputed facts demonstrate that David's stabbing of Albert resulted in injuries leading ultimately to the victim's death, and that death was an inherently probable consequence of David's conduct. Thus, the exclusion applies in this setting.

Defendants' second contention is equally unavailing. As noted, the wrongful death complaint makes a brief reference to David's purported "recklessness, negligence, and carelessness[.]" For purposes of the exclusion, however, we are persuaded that the gravamen of the wrongful death action from David's standpoint is that a single course of conduct resulted in liability. The heart of that action, as stated plainly in the complaint, is that David and Licata "instigated" the altercation "in which [Albert] was attacked and assaulted." Therefore, in this unique circumstance, the *Voorhees* requirement of considering separate allegations when determining an insurer's duty to defend has been satisfied.

To conclude otherwise would require us to assume that David's conduct in taking the knife was negligent or reckless, but that his act of thrusting it into Albert was intentional. Such fine parsing of facts may be appropriate in some settings. For our limited purposes, however, we view the insured's conduct to be a single act comprised of both the taking and thrusting of the knife into the victim. Because the probable consequences of that act inhere from the act itself, there is no coverage. Notwithstanding our conclusion that the exclusion applies irrespective of the disposition of the wrongful death action, we do not decide or suggest what issues or allegations remain to be tried in that action in respect of any party. We decide issues of coverage only.

Further, we note that David's father, also an insured, is in a different position. In addition to allegations against David, the wrongful death complaint also alleges that David's father was negligent and careless in his supervision of both his son and the insured premises on the night of Albert's death. Because Harleysville's action seeks a declaration concerning its responsibilities to David only, our disposition does not implicate the insurer's obligations in respect of any allegations against David's father.

Again, our approach has been replicated in other jurisdictions. One case, *Economy Fire & Casualty Insurance Co. v. Meyer, supra,* 427 *N.W.*2d 742, is particularly instructive. In that case, the insured, who had been "drinking heavily," visited his girl-

friend's house and found another man sleeping in her bed. *Ibid.* The insured took a knife and fork from his girlfriend's kitchen, then proceeded to the bedroom and stabbed the man. *Ibid.* The insured explained his conduct as follows:

> I walked into the bedroom and there was the guy, laying in her bed. And I guess it got the better of me. I went nuts. I ran into the kitchen and I opened up the kitchen drawer. I don't know what, which drawer it was. I grabbed whatever was in there. And I ran in and I hit him with it. I didn't know if it was a fork, spoon, knife, I didn't know what it was. But, I was just so mad and I just hit him with it. And after I did that I ran out of the room.
>
> [*Id.* at 743.]

The victim of the attack sued the insured for damages. As part of the settlement of that suit, the insured admitted negligence. *Ibid.* Notwithstanding that admission and the insured's explanation of his conduct, the trial court granted summary judgment in favor of the insurer, concluding that the insured's actions fell within the intentional-acts exclusion of his policy. *Ibid.* The court stated:

> To excuse [the insured's] conduct in this situation as an instinctive reflex in a provocative situation, a naked man in his girlfriend's bed, would in effect, legitimize lawlessness .... Similarly, [the insured's] return to the kitchen to arm himself to return to confront the naked man and stab him is not conduct an insured could reasonably expect to be covered by insurance.
>
> [*Ibid.*]

The victim appealed, and the appellate court affirmed. *Id.* at 742, 745. *See also Hanover Ins. Co. v. Newcomer, supra*, 585 S .W.2d at 287, 289 (enforcing exclusionary clause notwithstanding that one count of victim's complaint sought damages from insured "for wanton and reckless conduct without presence of mind").

Here, we accept as true David's repeated testimony that he did not intend Albert's death. That testimony, however, does not alter the reality that the insured affirmatively stabbed Albert with a knife, an inherently dangerous object, given to him by Licata for the purpose of cutting or harming the victim. See *N.J.S.A.* 2C:39–1r (defining weapons capable of lethal use to include certain knives). We are not confronted with a "king-of-the-hill assault" in which two teenagers caused no more "than passing discomfort." *Karlinski, supra,* 251 *N.J.Super.* at 465 n. 3, 598 *A.*2d 918.

Instead, as previously stated, the record demonstrates that the insured's conduct in taking and wielding the knife resulted in bodily injury leading to death, an inherently probable consequence of that action.

Further, that the record might suggest that David acted in self defense or was a reluctant combatant is not dispositive. We were informed at oral argument that although a self-defense exception to the intentional-wrong exclusion is available to policyholders, one was not procured for the policy here. We cannot, therefore, write for the insureds a better insurance policy than the one bargained for and purchased. *Zacarias, supra,* 168 *N.J.* at 595, 775 *A.*2d 1262; *cf. Aviation Charters, Inc. v. Avemco Ins. Co.,* 170 *N.J.* 76, 79, 784 *A.*2d 712 (2001) (cautioning that requiring causal connection between cause of accident at issue in that case and policy's unambiguous exclusionary clause would amount to " 'an unbargained-for expansion of coverage, *gratis,* resulting in the insurance company's exposure to a risk substantially broader than that expressly insured against in the policy.' " (quoting *Zuckerman v. Nat'l Union Fire Ins. Co.,* 100 *N.J.* 304, 324, 495 A.2d 395 (1985))).

Moreover, we are not presented with a situation in which insureds have claimed that they reasonably expected coverage for defense of themselves, their home, or family members when a burglar or stranger has broken into the insured premises. Whether coverage would apply in that instance would depend partly on the body of case law pertaining to the doctrine of reasonable expectations. See *Zacarias, supra,* 168 *N.J.* at 594–601, 775 *A.*2d 1262 (outlining contours of doctrine and relevant case law). Accordingly, our holding is not intended to address the situation in which a burglar unlawfully enters an insured's residence. That situation would be governed in part by principles not implicated in this appeal.

Additionally, our holding is not to be understood as establishing a *per se* rule of excluding coverage whenever a knife or similar instrument is used by an insured and results in injury or death. For example, if David and Albert had wrestled over control of the

knife and David inadvertently had cut into Albert, summary judgment might not have been appropriate. In any event, that another person may have handed David the knife, or implanted the thought of its use in his mind, does not alter the inherently probable consequences of the insured's conduct.

In the last analysis, our holding is compelled not only by a sensible application of prior case law, but by simple common sense. *See, e.g., Dynasty v. Princeton Ins. Co.,* 165 *N.J.* 1, 19, 754 *A.*2d 1137 (2000) (emphasizing that Court's decision in respect of increase-in-hazard exclusion in insurance policy was "dictated as much by common sense as by straightforward reading of the [insurance] statute"); *Vornado, Inc. v. Hyland,* 77 *N.J.* 347, 365, 390 *A.*2d 606 (1978) (Pashman, J., dissenting) (extolling virtue of "test of common sense" in resolving disputes). Logically, a person in David's position would have expected that serious injury or even death would have resulted from a heated altercation in which one party, armed with a knife, thrusts it quickly into an unarmed adversary. In short, we are persuaded that Harleysville did not assume the risk of liability on the record presented.

## IV.

In sum, we resolve this dispute by applying the principles articulated in *Voorhees* and *SL Industries.* If the insured's conduct is particularly reprehensible, then the insured's intent may be presumed as a matter of law, without further inquiry by a trier of fact into whether the insured intended to cause the actual injury that resulted. Absent such exceptional circumstances, further inquiry still may be unnecessary if the actual injury inflicted was an inherently probable consequence of the insured's conduct. Arguably, in this case, the fact that David initially hid the knife from Albert, and then thrust it twice into the victim's bare flesh, may be considered particularly reprehensible. Even if we assume that David's conduct did not rise to that level, the mortal injury inflicted on Albert was an inherently probable consequence of the insured's actions. Therefore, David's intent for purposes of the

exclusion may be found as a matter of law, without further inquiry by a trier of fact.

## V.

The judgment of the Appellate Division is reversed. The trial court's grant of summary judgment in favor of the insurer is reinstated.

LONG, J., dissenting.

Like the Appellate Division, I would reverse the grant of summary judgment in favor of Harleysville. I do not view this as a case in which David's intent can be presumed as a matter of law nor do I consider his essentially uncontroverted version of the events to warrant application of the "particularly reprehensible" conduct principle enunciated in *Voorhees, supra,* 128 *N.J.* at 184, 607 *A.*2d 1255. Indeed, the Appellate Division's statement of the facts relevant to an inquiry under *Brill, supra,* 142 *N.J.* 520, 666 *A.*2d 146, reveal that they are equivocal at best on the critical matter of intent and that the majority's view requires us to

ignore David's testimony as to his state of mind, his claimed desperate attempt to protect himself, everything that preceded the stabbing, and even the actual stabbing itself. As to that last point—the infliction of the knife wounds—it is significant that David described a swinging motion, with no attempt to stab and certainly no intent to stab in the heart or the stomach. Indeed, he says he thought he had cut Sabatelli's wrist, and only learned of Sabatelli's serious injury when someone else screamed and called it to his attention.

None of that evidence is refuted. There is no medical evidence describing the stab wounds, or any expert testimony indicating how the wounds were inflicted, their depth, the amount of force necessary to inflict them, or anything else which would contradict David's version of the incident. (footnote omitted).

Similarly, nothing has been presented to contradict defendant's version of Sabatelli's aggression, the beating Sabatelli was inflicting on David, David's being "terrified" of Sabatelli, and the practical impossibility of his avoiding the further confrontation which Sabatelli demanded. Under those circumstances, David's swinging the knife as he described, for the purpose of warding off Sabatelli's attack, could represent self-defense with no intention or expectation of inflicting an injury of any significant magnitude.

We do not, of course, hold that David's version of the incident must be accepted. But we do conclude (particularly with no conflicting testimony or other evidence),

that his story is not so improbable or unacceptable as to warrant rejection under the standard of *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). If David's description of Sabatelli's aggressiveness is accepted, then David's state of mind is not difficult to comprehend, and if both those propositions are accepted, then David's version of the actual stabbing is not so unlikely that a court must reject it and conclude that no rational jury could accept it. And finally, if David's description of the incident is accepted, then the *S.L. Industries* and *Karlinski* tests do not necessarily lead to the conclusion that Sabatelli's death was the "expected or intended" result of David's actions.

I fully agree with that analysis and subscribe to the Appellate Division's determination that "a trial is required to determine what took place on the evening in question, how Sabatelli's wounds were inflicted, and what David's intentions and expectations were in using the knife given him by Licata." Coverage should depend on the outcome of that trial.

I also subscribe to the Appellate Division's reversal of the summary judgment entered in favor of Harleysville on the duty to defend. The sole basis for the summary judgment was that there is no duty to defend in the absence of a duty to indemnify. Because I believe resolution of the duty to indemnify should await the outcome of the trial, the duty to defend should not be disposed of in such a way. *Burd v. Sussex Mut. Ins. Co.*, 56 *N.J.* 383, 389–90, 267 *A.*2d 7 (1970). For those reasons, I respectfully dissent.

Justice COLEMAN joins in this opinion.

*For reversal and reinstatement*—Chief Justice PORITZ and Justices STEIN, VERNIERO, LaVECCHIA, and ZAZZALI—5.

*For affirmance*—Justices COLEMAN and LONG—2.