795 A.2d 286 (2002)
350 N.J. Super. 316
PRUDENTIAL PROPERTY & CASUALTY INSURANCE COMPANY, Plaintiff Respondent,
v.
Bryan BRENNER; John Melchiondo; John Egnatowicz; William Johnson; Bryant D. Woods; Deborah Ann Peterson; Mike Reed; Zeus Sporting Goods Co., Defendants, and
Caroline M. Varkala, Administratrix and Administratrix ad Prosequendum of the Estate of George F. Varkala; Caroline M. Varkala, Individually; and Lorraine Varkala, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued November 28, 2001.
Decided April 22, 2002.
James Den Uyl argued the cause for appellants (LynchMartinKroll, attorneys; Mr. Den Uyl, of counsel; Emily J. Springer, on the brief).
Harry V. Osborne, II, Ocean, argued the cause for respondent (Evans, Osborne and Kreizman, attorneys; Mr. Osborne, on the brief).
Before Judges KING, CUFF and WINKELSTEIN.
*287 The opinion of the court was delivered by CUFF, J.A.D.
In this appeal we decide whether the homeowner's policy issued to the parents of a young man provides coverage for his involvement in the attempted robbery and death of another. The homeowner's policy contained an exclusion for injuries "arising out of the use, manufacture, sale, delivery, transfer, or possession by any person of a controlled dangerous substance." Judge Oles held that the exclusion applied to this matter and granted the insurer's summary judgment motion. We affirm.
On December 17, 1996, George Varkala (decedent or Varkala) was shot and killed in his home in Barnegat, Ocean County, during an attempt to rob him of a large stash of marijuana. His mother Caroline Varkala, commenced a wrongful death action; the decedent's sister is also a plaintiff in the wrongful death action. The Varkalas named as defendants all of the participants in the robbery. The parents of one of the defendants, Bryan Brenner, held a homeowner's policy issued by Prudential Property & Casualty Insurance Company (Prudential) and sought coverage under the policy.
On April 30, 1999, Prudential filed a declaratory judgment action seeking a declaration that Prudential owed no duty to defend or indemnify Brenner. On September 21, 2000, Judge Oles granted Prudential's summary judgment motion. In his oral opinion, he found that the Brenners' homeowner's policy clearly and unambiguously excluded coverage for injuries arising out of the transfer, use or possession of a controlled dangerous substance. Judge Oles stated:
It is undisputed that Mr. Brenner consumed marijuana within a period of several hours before proceeding to [decedent]'s home. Furthermore, the whole purpose for which the parties proceeded to [decedent]'s home was to acquire marijuana. The death of [decedent] had a substantial nexus with the acquisition of a controlled dangerous substance. See Records v. Aetna Life and Casualty Insurance, 294 N.J.Super. 463, 683 A.2d 834 (App.Div.1996)[, certif. denied, 151 N.J. 463, 700 A.2d 876 (1997) ].
It is from the September 21, 2000 order that the Varkalas appeal.

I.
These are the undisputed facts of the underlying incident derived from Brenner's statement to the police and the plea proceedings. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995) (the facts are considered in the light most favorable to the non-moving party). On December 17, 1996, Brenner, then sixteen, visited his friend John Melchiondo where they "smoked some pot, and [Brenner] had about three shots of vodka." While at the Melchiondo residence, Melchiondo spoke to John Egnatowicz on the telephone. During the conversation they discussed obtaining more marijuana from decedent. Melchiondo called decedent, a known supplier of large quantities of marijuana. Varkala refused to talk on the phone, but invited Melchiondo to his home to discuss the matter.
At approximately 8 p.m., Egnatowicz, William Johnson, and Bryant Woods arrived at Melchiondo's home. All five young men entered Johnson's vehicle. Brenner remembered feeling "a little buzzed at the time from the weed and alcohol." Brenner originally believed that the group was proceeding to Varkala's to purchase marijuana. He overheard, however, the others discuss "jack[ing] George's pot," which Brenner understood to mean stealing the marijuana. Also during the ride, *288 Brenner overheard them refer to a gun, which made him feel "uncomfortable and scared," but he was still willing to accompany them.
When the group arrived at Varkala's home, Melchiondo entered with Brenner and commenced his negotiations with Varkala who refused to "lend" them marijuana, which was apparently Varkala's common practice. Melchiondo left the house and returned two minutes later, when, as related by Brenner,
Bryant [Woods] comes into the house, holding a gun against John Melchiondo's head, and says where's the shit. He then throws John to the floor. John looked scared to [Brenner]. Bryant then starts waiving the gun at everyone, and says give me the shit, or I'll bust you ... [Varkala] then comes down the stairs, as he heard the noise. He did not exchange words with Bryant, but as he was about five feet away, he tried to swat the gun from Bryant's hand. Bryant shot him in the stomach, as he came down the stairs. [Varkala] fell to the ground, and as he fell, he came in contact with Bryant. Bryant then shot him in the head, and ran out ... [Varkala]'s mother then came to the den, but was too hysterical to talk to 911, so [Brenner] talked to them to say what happened. His sister Lorraine was also at the house at the time.
The decedent was airlifted to Cooper Hospital in Camden where he died a short time later.
Brenner was charged in a juvenile complaint with conspiracy to commit armed robbery, a second degree offense. Brenner pled guilty to the armed robbery before Judge Villano on May 23, 1997. In his factual statement in support of his plea, Brenner acknowledged he proceeded to decedent's home to steal a pound of marijuana. He was also aware that the others had a gun, but did not know that anyone planned to use it.

II
Brenner's parents purchased homeowner's insurance through Prudential; Bryan, as a family member, was an additional insured. Section II of the policy provided coverage for personal liability. The policy stated:
If a claim is made or suit is brought against an Insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies, we will:
a. pay up to our limit for damages which an Insured is legally liable; and
b. provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent....
The policy also contained an exclusion for bodily injury and property damage claims involving narcotics, specifically:
We do not cover bodily injury or property damage:
* * *
j. arising out of the use, sale, manufacture, delivery, transfer or possession by any person of a Controlled Substance(s) as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812. Controlled Substances include, but are not limited to cocaine, LSD, marijuana and all narcotic drugs. However, this exclusion does not apply to:
* * *
(2) The insured's [sic] who have no knowledge of the involvement with a controlled substance(s).
An insured's knowledge of such involvement must be shown by us by competent evidence of such knowledge.
*289 Prudential claims this provision excludes coverage of the December 17, 1996 incident. The Varkalas contend the language is ambiguous because it does not refer to an attempt to acquire illicit drugs. They also contend that the facts do not support the assertion that the shooting of Varkala arose out of a drug transaction.

III
We were informed at oral argument that this exclusion has appeared in homeowner's policies since 1995. We have not encountered this exclusion before this appeal and our research reveals no reported cases which have considered this exclusion.
We commence our analysis by recognizing two basic tenets. First, the words of an insurance policy are to be given their ordinary, plain meaning. Harleysville Ins. Cos. v. Garitta, 170 N.J. 223, 231, 785 A.2d 913 (2001); Aetna Cas. & Surety Co. v. Simone, 340 N.J.Super. 19, 24, 773 A.2d 722 (App.Div.2001), aff'd o.b., 170 N.J. 438, 790 A.2d 157 (2002). In the absence of an ambiguity, the policy should be enforced as written. Ibid. See also Zacarias v. Allstate Ins. Co., 168 N.J. 590, 595, 775 A.2d 1262 (2001). Second, although exclusions will be strictly construed, Princeton Insurance Company v. Chunmuang, 151 N.J. 80, 95, 698 A.2d 9 (1997), as long as the language is clear, unambiguous and not violative of public policy, the exclusion will be applied as written. Harleysville, supra, 170 N.J. at 231, 785 A.2d 913; Aetna, supra, 340 N.J.Super. at 24, 773 A.2d 722.
The Varkalas contend that Brenner's actions amounted to no more than an attempt to gain possession of marijuana. They argue the Prudential exclusion is ambiguous because it does not include attempts "arising out of the use, sale, manufacture, delivery transfer, or possession" of illegal drugs. Therefore, they insist the exclusion does not encompass Brenner's actions. We disagree.
We agree with Judge Oles that the language of the exclusion is clear and unambiguous. It excludes coverage for injuries which arise out of, are connected with, or are incident to the use and possession of illicit drugs. Brenner went to Varkala's house to obtain marijuana. He knew that his cohorts hoped to obtain a large amount of Varkala's stash. Ideally, they hoped that Varkala would give them the marijuana in recognition of their long-standing friendship and patronage. Brenner was also aware that his colleagues were prepared to steal the marijuana if Varkala did not agree to their plan. For purposes of this appeal, it is irrelevant that the main goal of the evening failed and that Brenner and others were charged with serious offenses. It is entirely relevant that their actions were wholly focused on the use and possession of illicit drugs. It is this activity which the exclusion clearly and expressly addresses. In the face of clear and unambiguous language and undisputed conduct encompassed by the policy language, we decline to engage in a strained construction to impose coverage.
Furthermore, the Varkalas' interpretation of the exclusionary language does not account for use of the "arising out of" phrase. Whether used in a provision defining coverage or in an exclusion, the phrase is defined broadly. In American Motorists Insurance Co. v. L-C-A Sales Co., 155 N.J. 29, 713 A.2d 1007 (1998), the Court considered the common meaning of the term. Justice Stein wrote:
The critical phrase "arising out of," which frequently appears in insurance policies, has been interpreted expansively by New Jersey courts in insurance coverage litigation. "The phrase `arising out of' has been defined broadly in *290 other insurance coverage decisions to mean conduct `originating from,' `growing out of' or having a `substantial nexus' with the activity for which coverage is provided." Records v. Aetna Life & Cas. Ins., 294 N.J.Super. 463, 468, 683 A.2d 834 (App.Div.1996) (quoting Westchester Fire Ins. Co. v. Continental Ins. Cos., 126 N.J.Super. 29, 38, 312 A.2d 664 (App.Div.1973), aff'd o.b., 65 N.J. 152, 319 A.2d 732 (1974)), certif. denied, 151 N.J. 463, 700 A.2d 876 (1997); see also Allstate Ins. Co. v. Moraca, 244 N.J.Super. 5, 13 n. 1, 581 A.2d 510 (App.Div. 1990) (noting that exclusionary language in homeowner's policy barring coverage for injuries "arising out of" ownership or use of motor vehicle was enforceable if "accident or injury `was connected with,' `had its origins in,' `grew out of,' `flowed from,' or `was incident to' the use of an automobile") (quoting Hogle v. Hogle, 167 Conn. 572, 356 A.2d 172 (1975)).
[Id. at 35-36, 713 A.2d 1007.]
Referring to the undisputed facts of record, there is a clear nexus between the fatal shooting of Varkala and Brenner's attempt to obtain illegal drugs. Records, supra, 294 N.J.Super. at 468, 683 A.2d 834. Brenner was present in Varkala's home only to obtain marijuana and Varkala's death was solely connected with and incident to an ill-conceived plan to obtain marijuana which went wildly and sadly awry. The language employed unmistakably encompasses more than the completed act of manufacture, use or transfer of a controlled dangerous substance. Judge Oles correctly concluded that the homeowner's policy excluded coverage for such actions.
Affirmed.