851 A.2d 751 (2004)
370 N.J. Super. 537
Christine PRIEST, Administratrix Ad Prosequendum and General Administratrix of the Estate of Chentele Stenger, Christine Priest, Individually, Donald Stenger, Administrator Ad Prosequendum, and Donald Stenger, Individually, Plaintiffs-Respondents,
v.
Matthew RONCONE, Defendant/Third-Party Plaintiff-Respondent,
v.
The Selective Insurance Company of America, Third-Party Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 17, 2004.
Decided July 6, 2004.
*753 Gary S. Kull, Gladstone, argued the cause for appellant Selective Insurance Company of America (Carroll, McNulty & Kull, attorneys; Mr. Kull, and Janice F. Dolan, of counsel and on the brief).
David E. Poplar, Cherry Hill, argued the cause for respondents Christine Priest, Administratrix Ad Prosequendum and General Administratrix of the Estate of Chentele Stenger, Christine Priest, Individually, Donald Stenger, Administrator Ad Prosequendum, and Donald Stenger, Individually (Carl D. Poplar, attorneys; Mr. David Poplar, on the brief).
J. Michael Farrell, attorney for respondent Matthew Roncone, relies on respondents' brief.
Before Judges PETRELLA, COLLESTER and FUENTES.
*752 The opinion of the court was delivered by FUENTES, J.A.D.
This is a declaratory judgment action brought by Matthew Roncone against Selective Insurance Company (Selective). The trial court granted summary judgment in favor of Roncone, holding that Selective was legally obligated to provide him coverage under his homeowners' policy, in connection with a survival and wrongful death action brought against him by the parents of decedent Chentele Stenger, in their individual capacities and as administrators ad prosequendum.[1]
This appeal requires us to address two principal legal questions: (1) whether decedent was an "insured" within the meaning of the Selective policy, and thus excluded from the class of potential claimants; and (2) whether coverage for the independent wrongful death claim brought by decedent's parents is barred by the policy's intentional wrongs exclusion. The trial court answered "no" to both of these questions. We disagree as to question (1) and reverse. As to question (2), we remand for an evidentiary hearing for the trial court to determine whether Roncone's criminal act triggers the policy's intentional wrongs exclusion.
The core facts necessary to address the intra-family exclusion issue are not in dispute.

I
Roncone and Christine Priest began a two-year relationship that culminated in the birth of their daughter Lauren in April 1993. The couple had an apparent committed and monogamous relationship, at times representing themselves as "married." After Lauren's birth, Priest moved from her parents' home to Roncone's newly-built home in Sewell, with Chentele, her four-year-old daughter from an earlier relationship with Donald Stenger.
Chentele had her own bedroom in Roncone's house. Priest described the relationship between Roncone and Chentele as "affectionate," with Roncone acting like a "father figure." He cared for both Chentele *754 and Lauren on the evenings and weekends while Priest worked.
Priest worked the morning of Saturday, December 11, 1993, leaving Chentele and Lauren in Roncone's care. At approximately 10:45 a.m., Priest received a call from Roncone requesting her to come home because Chentele had fallen down the stairs and was immobile. Roncone explained that he instructed Chentele to go downstairs while he fed the baby. He subsequently heard a noise and found Chentele lying at the bottom of the steps. Roncone adamantly denied causing Chentele's injuries, but admitted to shaking her in an attempt to wake her from her stupor.
Chentele was removed from life support on Monday, December 13, 1993. An autopsy indicated that she died from brain injuries. Roncone was indicted for murder, N.J.S.A. 2C:11-3. After a jury trial, he was convicted of second-degree manslaughter. N.J.S.A. 2C:11-4b(1).
Under Roncone's homeowners' policy, the term "insured" is defined as "you and residents of your household who are: (a) your relatives; or (b) other persons under the age of 21 and in the care of any person named above." The policy defines an "occurrence" as "an accident, including exposure to conditions, which results, during the policy period, in: (a) bodily injury; or (b) property damage." The Personal Liability provision extends coverage in connection with a claim or suit brought "against an insured for damages because of bodily injury or property damage caused by an occurrence." The policy excludes from coverage (1) bodily injury "which is expected or intended by the insured;" and (2) bodily injury to an "insured."
With respect to decedent's survival claim under N.J.S.A. 2A:15-3, Selective disclaimed liability because Chentele was (1) a resident in the Roncone household; (2) under the age of twenty-one; and (3) in his care at the time of her death. The first two definitional elements are not in contention.[2] Chentele was a four-year-old child residing in Roncone's house with her mother.
In its decision directing Selective to provide coverage, the trial court focused on the phrase "in the care of." The court found this phrase to be reasonably susceptible to different meanings. To resolve this alleged ambiguity, the court inserted the word "primary" into the phrase "in the care of," thus creating the phrase "in the primary care of." Armed with this judicially-crafted language, the court concluded that decedent was not in Roncone's "primary" care at the time he recklessly caused her death.
We are unable to find any factual or legal support for this material alteration of the policy.

II
We will start our analysis by reaffirming certain basic principles of insurance law. As contracts of adhesion, insurance policies are subject to special rules of interpretation. Araya v. Farm Family Cas. Ins. Co., 353 N.J.Super. 203, 206, 801 A.2d 1194 (App.Div.), certif. denied, 175 N.J. 77, 812 A.2d 1109 (2002). Insurance policies must be construed liberally *755 and in favor of the insured's reasonable expectations of coverage. Gibson v. Callaghan, 158 N.J. 662, 671, 730 A.2d 1278 (1999); United Servs. Auto. Ass'n v. Turck, 156 N.J. 480, 492-93, 721 A.2d 1 (1998).
However, in interpreting a policy of insurance, words should be given their ordinary meaning. Zacarias v. Allstate Ins. Co., 168 N.J. 590, 595, 775 A.2d 1262 (2001). "In the absence of any ambiguity, courts `should not write for the insured a better policy of insurance than the one purchased.'" Gibson v. Callaghan, supra, 158 N.J. at 670, 730 A.2d 1278 (citation omitted). If the express language of the policy is clear and unambiguous, "`the court is bound to enforce the policy as it is written.'" Royal Ins. Co. v. Rutgers Cas. Ins. Co., 271 N.J.Super. 409, 416, 638 A.2d 924 (App.Div.1994) (citation omitted).
A word or phrase is not automatically rendered ambiguous simply because the policy fails to define it. See Boddy v. Cigna Prop. & Cas. Cos., 334 N.J.Super. 649, 656-57, 760 A.2d 823 (App.Div.2000). Where, as here, the policy fails to define a term or phrase, "the words must be interpreted in accordance with their ordinary, plain and usual meaning." Daus v. Marble, 270 N.J.Super. 241, 251, 636 A.2d 1091 (App.Div.1994).
In construing the phrase "in the care of," we will utilize an approach rooted in common sense and based on the words' ordinary meaning, without inserting legalisms in an attempt to obfuscate their meaning, thereby creating a judicially-contrived ambiguity where none exists. There is nothing ambiguous about the phrase "in the care of." We expect a reasonable insured reading this phrase to give it a plain, ordinary meaning. Webster's II New College Dictionary 168 (2001), defines "care" as "the function of watching, guarding or overseeing." The word "care" is typically associated with the supervision of children and other physically vulnerable or dependent individuals such as the elderly or infirm.
We are satisfied that the phrase "in the care of does not require the existence of a formal, judicially-sanctioned custodial or guardianship relationship. It is sufficient for the individual to temporarily assume the responsibility for the supervision, well-being and safety of a child. Our conclusion is bolstered by similar conclusions reached in other jurisdictions that have examined this issue.
In Henderson v. State Farm Fire & Cas. Co., 460 Mich. 348, 596 N.W.2d 190 (1999), the Michigan Supreme Court addressed this precise issue. There, the eighteen-year-old girlfriend of the homeowners' son was temporarily residing with the homeowners when an altercation occurred, resulting in the injury of plaintiff. Plaintiff sued the girlfriend for negligence and the insurer disputed coverage.
In finding the phrase unambiguous, the Henderson Court noted the lower court's "[failure] to recognize that this phrase is a colloquial or idiomatic phrase that is peculiar to itself and readily understood as a phrase by speakers and readers of our language." Id. at 194. Courts in other jurisdictions have followed Henderson in finding the phrase "in the care of" unambiguous; the New Hampshire Supreme Court in Oliva v. Vermont Mut. Ins. Co., 150 N.H. 563, 842 A.2d 92, 95 (2004), and the Wisconsin Appellate Division in Cierzan ex rel. Weis v. Kriegel, 259 Wis.2d 264, 655 N.W.2d 217, 221 (App.2002), review denied, 260 Wis. 2d 754, 661 N.W.2d 102 (2003).
The Henderson Court listed the following factors that a court may look to *756 in ascertaining whether a person is in the care of the insured. Those factors include:
(1) is there a legal responsibility to care for the person;
(2) is there some form of dependency;
(3) is there a supervisory or disciplinary responsibility;
(4) is the person providing the care providing substantial essential financial support;
(5) is the living arrangement temporary or permanent, including how long it has been in existence and is expected to continue;
(6) what is the age of the person alleged to be "in the care of" another (generally, the younger a person the more likely they are to be "in the care" of another);
(7) what is the physical or mental health status of the person alleged to be "in the care of" another (a person with health problems is more likely to be "in the care" of another); and
(8) is the person allegedly "in the care of" another gainfully employed (a person so employed is less likely to be truly dependent on another)?
[Id. at 195-96.]
We agree with this commonsense approach and adopt the Henderson factors as analytical tools for determining whether decedent here was in the care of Roncone at the time of her death. These factors are not intended to provide an exhaustive list of relevant considerations. They are meant only to provide a reviewing court with an analytical starting point on the subject.
Applying the Henderson factors to the facts here, we note that factors (3), (5) and (6) apply because: (a) Chentele was left in the physical care of Roncone on the day of her death; (b) as the only adult in the house Roncone was responsible for her supervision, nourishment and general well-being; (c) the living arrangement was permanent and long-standing, with the child having her own room in the house for a period of months before her death; and (d) Chentele was four years old. Under these circumstances, Chentele was an "insured" within the meaning of the Selective policy and excluded from the class of individuals legally capable of bringing a claim thereunder.

III
Resolution of the intra-family exclusion issue does not end the discussion. As decedent's parents, Priest and Stenger have a legally independent right to bring a wrongful death action. Gershon v. Regency Diving Ctr., Inc., 368 N.J.Super. 237, 246, 845 A.2d 720 (App.Div.2004). They are also clearly not "insureds" under the policy. Selective contends, however, that their claim for coverage is barred by the section excluding bodily injury "which is expected or intended by the insured." The record here is insufficient to determine this issue.
We begin our analysis of this issue by emphasizing that exclusions based on intentional wrongful acts are common, legally acceptable and consistent with public policy. Figueroa v. Hartford Ins. Co., 241 N.J.Super. 578, 582, 575 A.2d 888 (App.Div.1990). Although a criminal conviction is not a mandatory precursor to coverage determinations, Mroz v. Smith, 261 N.J.Super. 133, 137, 617 A.2d 1259 (App.Div.1992), a criminal conviction can bring the act within the exclusion. Princeton Ins. Co. v. Chunmuang, 151 N.J. 80, 96, 698 A.2d 9 (1997).
Generally, a court must examine the actor's subjective intent. Harleysville Ins. Cos. v. Garitta, 170 N.J. 223, 234, 785 A.2d 913 (2001). Where the actions are *757 `particularly reprehensible' [however,] an intent to injure can be presumed from the act without an inquiry into the actor's subjective intent. Mroz v. Smith, supra, 261 N.J.Super. at 138, 617 A.2d 1259 (quoting Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 184, 607 A.2d 1255 (1992)). Thus, we have denied coverage in suits based on the insured's failure to advise his sexual partner of his HIV-positive status, F.S. v. L.D., 362 N.J.Super. 161, 827 A.2d 335 (App.Div.2003); based on violations of the Domestic Violence Act, Bittner v. Harleysville Ins. Co., 338 N.J.Super. 447, 769 A.2d 1085 (App.Div.2001); to individuals sued for spousal abuse, Merrimack Mut. Fire Ins. Co. v. Coppola, 299 N.J.Super. 219, 690 A.2d 1059 (App.Div.1997); and in cases involving the sexual molestation of children, Atlantic Employers Ins. Co. v. Tots & Toddlers Pre-School Day Care Ctr., Inc., 239 N.J.Super. 276, 571 A.2d 300 (App.Div.), certif. denied, 122 N.J. 147, 584 A.2d 218 (1990).
In all of these cases, the record permitted a rational inference that the insured's actions were intentional or substantially likely to cause the resulting injury. Here, the jury convicted Roncone of the crime of second-degree reckless manslaughter as a lesser included offense of murder. N.J.S.A. 2C:11-4 defines reckless manslaughter as a criminal homicide that is committed "recklessly." Pursuant to N.J.S.A. 2C:2-2b(3), a person acts recklessly,
with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. "Recklessness," "with recklessness" or equivalent terms have the same meaning.
In this civil action, the only version of how Chentele suffered the injuries that caused her death come from Roncone himself. He claims that the child accidentally fell down the stairs while he was attending eight-month-old Lauren. When he rushed to investigate the noise caused by her fall, he found Chentele at the bottom of the stairs in a semiconscious state. He shook the child only as an attempt to bring her to consciousness. We conclude from the guilty verdict that the criminal jury rejected this version of events. However, without more, we cannot conclude that Roncone's actions fall within the policy's intentional wrongs exclusion.
Although causing the death of a four-year-old child is inherently a "particularly reprehensible" act, the jury's verdict does not provide a rational basis from which to presume that Roncone acted in such a manner that Chentele's death was an intended or expected consequence of his actions. Compare Harleysville Ins. Cos. v. Garitta, supra, 170 N.J. at 228, 785 A.2d 913, where the insured stabbed the victim twice in the torso area, puncturing his heart and stomach. Under these circumstances, the Supreme Court concluded that "[t]he insurer has demonstrated that the insured intended to cause some injury, and that the actual injury that led to [the victim's] death was an inherently probable consequence of the insured's actions." Id. at 235, 785 A.2d 913.
Here, what is missing from the record before us is the State's version of how this child died. We presume that, at the very least, the State's evidence in the criminal trial consisted of the testimony and findings of the medical examiner. This evidence should have included a forensic analysis *758 of the injuries and how they caused Chentele's death. This medical evidence may provide insight into Roncone's state of mind. Depending on this and other evidence that may be revealed in the course of an evidentiary hearing, the trial court may be capable of inferring whether Roncone's actions fall within the scope of the policy's intentional wrongs exclusion.

IV

Conclusion
We reverse the trial court's determination that decedent was not an "insured" under the policy's intra-family exclusion. We remand for an evidentiary hearing to determine whether the insured's actions fall within the intentional wrongs exclusion. We do not retain jurisdiction.
NOTES
[1] The parties entered into a consent judgment against Roncone in the amount of $300,000. By stipulation, they also agreed to limit Selective's liability to $100,000, in the event we were to affirm the trial court's judgment.
[2] In the course of arguing the summary judgment motion before the Law Division, counsel for Roncone claimed that Priest held a New Jersey driver's license indicating that she resided with her parents. Thus, by implication, Chentele's residence may appear to be in dispute. There is no competent evidence in the record before us to support this contention. All of the evidence indicates that Chentele resided with her mother at Roncone's house up to the time of her death.