840 A.2d 915 (2004)
366 N.J. Super. 165
HAMPTON MEDICAL GROUP, P.A., Psychiatric Associates of New Jersey, P.A., and A.L. Carter Pottash, M.D., Plaintiffs-Respondents,
v.
PRINCETON INSURANCE COMPANY, Defendant-Appellant, and
Travelers Insurance Company, Medical Inter-Insurance Exchange of New Jersey, RLI Insurance Company, Legion Insurance Company, Psychiatrists' Risk Retention Group, Inc., Atlantic Mutual Insurance Company, Fireman's Fund Insurance Company and John Does 1-10, Defendants.
Hampton Medical Group, P.A.; Psychiatric Associates of New Jersey, P.A. and A.L. Carter Pottash, M.D., Plaintiffs-Respondents,
v.
Medical Inter-Insurance Exchange of New Jersey, Defendant-Appellant, and
Travelers Insurance Company, Princeton Insurance Company, RLI Insurance Company, Legion Insurance Company, Psychiatrists' Risk Retention Group, Inc., Atlantic Mutual Insurance Company, Fireman's Fund Insurance Company and John Does 1-10, Defendants.
Superior Court of New Jersey, Appellate Division.
Submitted November 17, 2003.
Decided January 29, 2004.
*917 Mendes & Mount, Newark, for appellant Princeton Insurance Company (William S. Wachenfeld, of counsel; Laura E. Genovese, on the brief).
Saiber Schlesinger Satz & Goldstein, Newark, for appellant MIIX Insurance Company, successor to Medical Inter-Insurance Exchange of New Jersey (David J. D'Aloia, Michelle V. Fleishman, and Melissa A. Provost, on the brief).
Ashley & Charles, Newark, for respondents Hampton Medical Group and Psychiatric Associates of New Jersey (Thomas R. Ashley, on the joint brief).
Arsenault Fassett & Mariano, for respondent A.L. Carter Pottash, M.D. (David W. Fassett, on the joint brief).
Before Judges PETRELLA, WEFING and COLLESTER.
*916 The opinion of the court was delivered by WEFING, J.A.D.
These two matters were calendared before us back-to-back. Because they present identical issues, we consolidate them for purposes of this opinion. In A-4504-02, Princeton Insurance Co. appeals pursuant to leave granted from a trial court order finding it has a duty to defend its insureds, Hampton Medical Group, P.A., Psychiatric Associates of New Jersey, P.A. and A.L. Carter Pottash, M.D. ("plaintiffs") in connection with a pending action, Blue Cross and Blue Shield of New Jersey, Inc. v. Hampton Medical Group, P.A., et al., docket no. ESX-L-289-95. In A-4508-02, we granted leave to appeal to MIIX Insurance Company, successor to Medical Inter-Insurance Exchange of New Jersey ("MIIX"), to appeal from the same order, which found it had a similar duty. After reviewing the record in light of the contentions advanced on appeal, we reverse.
Plaintiff Hampton Medical Group, P.A. had a contract to provide psychiatric physician services to Hampton Hospital, a one-hundred bed psychiatric facility located in Rancocas, New Jersey. Plaintiff Psychiatric Associates of New Jersey, P.A. had a contract to provide psychiatric physician services at Fair Oaks Hospital, located in Summit, New Jersey. Plaintiff Pottash is a licensed medical doctor and the president of both Hampton Medical and Psychiatric Associates. He was also a shareholder in both professional associations.
Defendant Princeton issued a professional liability insurance policy to plaintiffs for the period May 1985 through May 1991. Defendant MIIX issued a professional liability insurance policy to plaintiffs for the period March 1991 through April 1995.
Both policies provided coverage for claims asserting professional liability against the professional associations and individuals. Under Princeton's policy, in the case of a claim of individual liability, it agreed to
Pay all amounts ... which you become legally obligated to pay as a result of injury to which this insurance applies. The injury must be caused by a "medical *918 incident" arising out of your supplying or failure to supply professional services.
Princeton's policy contained similar language for claims asserted against the professional associations, specifying that the "injury must be caused by a `medical incident' arising out of the supplying of or failure to supply professional services by you or anyone for whose professional acts or whose failure to act you are legally responsible." Princeton's policy defined "medical incident" in the following manner:
"medical incident" means any act or failure to act:
(a) Individual Professional Liability(1) in the furnishing of the professional medical ... services by you, any employee of yours....
(b) Partnership, Association or Corporation Professional Liabilityin the furnishing of professional medical ... services by (1) any member, partner, officer, director, stockholder, or employee of yours or (2) any person acting under your personal direction, control, or supervision.
Under MIIX's policy, it agreed to "pay... all sums which the insured shall become legally obligated to pay as damages because of ... [i]njury arising out of the rendering of or failure to render ... professional services." MIIX defined a medical incident as "a single act or omission or a series of related acts or omissions in the rendering of or failure to render professional services to any one person." It also defined professional services as "services requiring specialized knowledge and mental skill in the practice of the profession described in the declarations...." The declaration sheet stated the insured's principal practice to be psychiatry.
Each policy explicitly excluded coverage for criminal acts. Princeton's policy also excluded coverage for liability as a proprietor, officer or stockholder of any business. MIIX's policy contained a similar exclusion from coverage for liability as proprietor, superintendent or officer of a business enterprise as well as an exclusion for "willful, fraudulent or malicious acts."
In December 1994, Blue Cross/Blue Shield of New Jersey, Inc. filed a complaint against these plaintiffs and others in which it sought reimbursement for more than three million dollars in health insurance benefits which it alleged were improperly paid to these plaintiffs. Blue Cross/Blue Shield's complaint asserted claims based on fraud, violations of the Insurance Fraud Prevention Act, N.J.S.A. 17:33A-1 to -30, intentional misrepresentation, negligent misrepresentation and unjust enrichment. Blue Cross/Blue Shield alleged that plaintiffs, over a number of years, would hospitalize patients inappropriately to trigger health insurance coverage, would treat patients for longer than was medically necessary or in ways not medically necessary in order to obtain payment under Blue Cross/Blue Shield health insurance policies and would bill Blue Cross/Blue Shield for services they did not render.
The policies issued by Princeton and MIIX were in effect during the time period covered by the Blue Cross/Blue Shield complaint. Plaintiffs forwarded a copy of this complaint to Princeton and MIIX, demanding they provide a defense and indemnification against these claims. When neither insurer complied, plaintiffs filed this declaratory judgment action in March 2001.[1]
*919 There is no indication in the record before us that the declaratory judgment action was consolidated with the Blue Cross/ Blue Shield matter. The prosecution of both matters was significantly delayed by the fact that certain of the defendants in the Blue Cross/Blue Shield matter held policies of insurance issued by Legion Insurance Company, whose entry into reorganization resulted in the imposition of various stays. We have previously acknowledged the impact upon New Jersey litigation of Legion's impaired financial condition. Aly v. E.S. Sutton Realty, 360 N.J.Super. 214, 822 A.2d 615 (App.Div. 2003).
At several points in the declaratory judgment litigation, plaintiffs and Princeton and MIIX sought partial summary judgment. Ultimately, the trial court ruled that, in light of the fact that Blue Cross/Blue Shield included a count for negligent misrepresentation in its complaint, both Princeton and MIIX had an obligation to provide a defense to plaintiffs in that litigation. The trial court did not address the significance of the exclusions cited by the insurers nor that Blue Cross/ Blue Shield was seeking punitive damages in addition to reimbursement. The trial court recognized, however, that Princeton and MIIX could not control the defense of the Blue Cross/Blue Shield litigation because their interests in that litigation were divergent from the interests of their insureds. Relying on Burd v. Sussex Mutual Insurance Co., 56 N.J. 383, 267 A.2d 7 (1970), it included in its order a provision that the duty to defend the Blue Cross/ Blue Shield action was "converted into a duty to reimburse defense costs incurred by Plaintiffs in the Blue Cross Action, the scope of which duty shall be determined in the future." We granted leave to appeal from that order.

I
Before proceeding to an analysis of the question, we note the well-settled principles that must guide any interpretation of policies of insurance. The general principles of insurance contract interpretation were set out by the Supreme Court in Zacarias v. Allstate Ins. Co., 168 N.J. 590, 775 A.2d 1262 (2001).
In the first instance, the words of an insurance policy are to be given their plain, ordinary meaning. In the absence of any ambiguity, courts should not write for the insured a better policy of insurance than the one purchased. However, insurance policies are contracts of adhesion and as such, are subject to special rules of interpretation. When there is ambiguity in an insurance contract, courts interpret the contract to comport with the reasonable expectations of the insured, even if a close reading of the written text reveals a contrary meaning. The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.
....
[I]n enforcing an insurance policy, courts will depart from the literal text and interpret it in accordance with the insured's understanding, even when that understanding contradicts the insurer's intent, if the text appears overly technical or contains hidden pitfalls, cannot be understood without employing subtle or legalistic distinctions, is obscured by fine *920 print, or requires strenuous study to comprehend.
[Id. at 595, 601, 775 A.2d at 1264-65, 1268 (quotations and citations omitted).]
Principles of insurance contract interpretation "mandate [a] broad reading of coverage provisions, [a] narrow reading of exclusionary provisions, [the] resolution of ambiguities in the insured's favor, and [a] construction consistent with the insured's reasonable expectations." Search EDP, Inc. v. Am. Home Assur. Co., 267 N.J.Super. 537, 542, 632 A.2d 286, 289 (App.Div.1993), certif. denied, 135 N.J. 466, 640 A.2d 848 (1994). "If there is any doubt, uncertainty or ambiguity in the phraseology of a policy, or if the phraseology is susceptible to two meanings, the construction favoring coverage must be adopted." Aetna Ins. Co. v. Weiss, 174 N.J.Super. 292, 296, 416 A.2d 426, 428 (App.Div.), certif. denied, 85 N.J. 127, 425 A.2d 284 (1980).
The words of an insurance policy are to be given their plain ordinary meaning. Harleysville Ins. Companies v. Garitta, 170 N.J. 223, 231, 785 A.2d 913, 917 (2001) (holding that homeowners insurance did not provide coverage in wrongful death suit following a fatal stabbing). "[E]xclusions are presumptively valid and will be given effect if `specific, plain, clear, prominent, and not contrary to public policy.' " Miller v. McClure, 326 N.J.Super. 558, 565, 742 A.2d 564, 568 (App.Div.1998), aff'd o.b., 162 N.J. 575, 745 A.2d 1162 (1999) (quoting Princeton Ins. Co. v. Chunmuang, 151 N.J. 80, 95, 698 A.2d 9, 17 (1997)) (holding defendant not entitled to coverage under his employer's comprehensive general liability and employer's liability policies and his own homeowner's policy in a suit alleging sexual harassment and discrimination). Policy provisions that exclude coverage for intentional wrongful acts are common, accepted as valid, and consistent with public policy. Harleysville, supra, 170 N.J. at 231, 785 A.2d at 917-18. Nevertheless, exclusions must be narrowly construed, and the insurer bears the burden of proof that the exclusion applies. Miller, supra, 326 N.J.Super. at 565, 742 A.2d at 568-69.
Finally, we are cognizant of the fact that plaintiffs were asserting a duty to defend, as opposed to a duty to indemnify. "[T]he duty to defend comes into being when the complaint states a claim constituting a risk insured against." Danek v. Hommer, 28 N.J.Super. 68, 77, 100 A.2d 198, 203 (App.Div.1953), aff'd o.b., 15 N.J. 573, 105 A.2d 677 (1954). When the allegations in a complaint correspond with the language of the policy, the duty to defend arises, irrespective of the claim's actual merit. Id. at 76-77, 100 A.2d at 202-03. If the pleading is ambiguous, doubts should be resolved in favor of the insured and thus in favor of the duty to defend. Central Nat'l Ins. Co. v. Utica Nat'l Ins. Group, 232 N.J.Super. 467, 470, 557 A.2d 693, 694 (App.Div.1989). When multiple alternative causes of action are stated, the duty to defend will continue until every covered claim is eliminated. Mt. Hope Inn v. Travelers Indem. Co., 157 N.J.Super. 431, 440-41, 384 A.2d 1159, 1163-64 (Law Div.1978).
To hold otherwise would be to place upon the insured the burden of demonstrating in advance of the underlying litigation which of the competing theories of recovery against it was applicable for purposes of insurance, thereby frustrating one of the basic purposes of such a clause in the insurance contract protection of the insured from the expenses of litigation.
[Solo Cup Co. v. Federal Ins. Co., 619 F.2d 1178, 1185 (7th Cir.), cert. denied, *921 449 U.S. 1033, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980).]
The duty to defend
is not abrogated by the fact that the cause of action stated cannot be maintained against the insured either in law or in factin other words, because the cause is groundless, false or fraudulent. Liability of the insured to the plaintiff is not the criterion; it is the allegation in the complaint of a cause of action which, if sustained, will impose a liability covered by the policy.
[Danek v. Hommer, supra, 28 N.J.Super. at 77, 100 A.2d at 203.]

II
We are satisfied that the trial court erred when it found these insurers had a duty to defend these plaintiffs in the Blue Cross/Blue Shield litigation. The policies afford coverage for an injury arising out of the physician's rendering or failure to render professional services, all in the context of a medical incident. In our judgment, Blue Cross/Blue Shield's claim for reimbursement cannot fairly be characterized as a claim for damages arising out of a physician's rendering or failure to render professional services. Nor do we consider its claim for reimbursement to represent a medical incident.
Blue Cross/Blue Shield is not seeking compensatory damages because it was injured by professional services which did not meet the appropriate standard of professional care. Rather, it is seeking reimbursement for sums it alleges were improperly billed to it.
Reported New Jersey cases have discussed what constitutes professional services for purposes of insurance coverage. In Atlantic Mut. Ins. v. Continental Nat. Am. Ins., 123 N.J.Super. 241, 302 A.2d 177 (Law Div.1973), there was a coverage dispute between plaintiff, which had issued a comprehensive general liability policy to an engineering firm and defendant, which had issued a professional liability policy. The engineering firm had been sued by two workers who were injured when a trench they were digging collapsed. After those claims were settled, this litigation was instituted to determine which carrier was obligated for the settlement. The court cited the discussion of what constitutes a professional act contained in 7A Appleman, Insurance Law and Practice § 4504.3.
A `professional' act or service within a malpractice policy is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor or skill and the labor or skill is predominantly mental or intellectual, rather than physical or manual.
[Id. at 246, 302 A.2d at 180.]
Based upon that discussion, the trial court concluded that determining the proper method to brace a trench under construction required the "specialized knowledge and mental skill of a professional engineer" and thus the malpractice carrier was obligated for the settlement. Id. at 247, 302 A.2d at 181.
The New Jersey Supreme Court noted that definition in Princeton Insurance Co. v. Chunmuang, supra, 151 N.J. 80, 698 A.2d 9. Princeton had issued a professional liability policy to Dr. Chunmuang, who was sued by a patient whom he had molested during the course of a gynecological exam. The Court concluded that, to the extent his patient's damages were the result of a criminal act, Princeton was entitled to invoke the policy's criminal acts exclusion, but that Princeton would be responsible for so much of her damages as flowed from Dr. Chunmuang's medical malpractice. It remanded the matter for a hearing on that issue.
*922 We touched tangentially upon the concept of professional services in Records v. Aetna Life and Casualty Insurance, 294 N.J.Super. 463, 683 A.2d 834 (App.Div. 1996), certif. denied, 151 N.J. 463, 700 A.2d 876 (1997). In Records, a physician grew agitated when he learned that a nurse had transferred his patient from a nursing home to a hospital without informing him. He grabbed the nurse by her arm and led her into a nearby lounge where he screamed at her and pointed his finger in her face, all while maintaining his grasp of her arm. Id. at 465, 683 A.2d at 835. She alleged her back was injured in the incident and she sued the physician alleging negligence and assault and battery. The doctor sought a defense and indemnification from both his homeowner's insurance and his malpractice insurance. Both carriers denied coverage and the doctor commenced a declaratory judgment action. Id. at 466, 683 A.2d at 836. We affirmed the trial court's decision that the doctor was entitled to a defense and indemnification under his malpractice policy but not his homeowner's policy. Id. at 467, 683 A.2d at 836.
The malpractice policy provided coverage for "injury arising out of the rendering of or failure to render ... professional services." Ibid. Our analysis focused on the phrase "arising out of." We noted that other insurance coverage decisions interpreted the phrase broadly to mean "growing out of" or having a "substantial nexus." Id. at 468, 683 A.2d at 837. We held that a substantial nexus existed between the physician's conduct toward the nurse and the care of his patients at the nursing home. Id. at 467-71, 683 A.2d at 836-38. We were not called upon in Records to determine whether the confrontation between the doctor and the nurse constituted a "medical incident."
These cases are not dispositive of the issue before us. The Court in Chunmuang enforced a criminal acts exclusion but recognized also that Chunmuang's patient was injured as a result of his medical actions. There was no question but that a "medical incident" had occurred, and the Supreme Court, like this court in Records, was not called upon to consider what constitutes a medical incident.
Courts in other jurisdictions have recognized that there is a distinction between services rendered by a professional which involve such "specialized knowledge, labor or skill" and activities by that same professional rendered as part of conducting business. Harad v. Aetna Casualty and Surety Co., 839 F.2d 979 (3d Cir.1988), is instructive. Plaintiff Harad was a Pennsylvania attorney who had been sued on a claim of malicious prosecution. He had two policies of insurance, one issued by Aetna and one issued by Home Insurance Company. The Aetna policy provided coverage for liability arising out of the conduct of the insured's business but specifically excluded coverage for injury arising out of the rendering or failure to render any professional service. Id. at 983. The court concluded that because the underlying claim against Harad arose out of his filing a complaint, Aetna was entitled to rely upon this professional services exclusion. In the course of its opinion, the court said,
[T]he practice of law, as other similarly regulated professional activity in today's world, has two very different and often overlooked componentsthe professional and the commercial. The professional aspect of a law practice obviously involves the rendering of legal advice to and advocacy on behalf of clients for which the attorney is held to a certain minimum professional and ethical standard. The commercial aspect involves the setting up and running of a business, *923 i.e., securing office space, hiring staff, paying bills and collecting on accounts receivable, etc., in which capacity the attorney acting as businessperson is held to the same reasonable person standard as any other. Indeed, the professional services and the business distinction drawn by the two policies and Harad's recognition of the limitations inherent in each is manifested by the fact that Harad purchased a separate professional liability policy from Home.
[Id. at 985.]
The Harad court cited the same section of Appleman discussed in Atlantic Mutual Insurance, supra. The Harad court referred, however, to Professor Appleman's concluding remark, "In determining whether a particular act is of a `professional nature or a professional service,' we must look not to the title or character of the party performing the act, but to the act itself." Id. at 984.
A similar distinction was recognized in Medical Records Associates, Inc. v. American Empire Surplus Lines Insurance Co., 142 F.3d 512 (1st Cir.1998). Plaintiff in that case was in the business of processing medical records and it was insured under a professional errors and omissions policy issued by defendant. When it was threatened with litigation for alleged overbilling, it sought coverage from American Empire. American Empire, however, declined to afford coverage and this declaratory judgment action resulted. The First Circuit concluded that plaintiff's billing practices did not constitute professional services and affirmed a trial court ruling that American Empire's policy did not cover plaintiff's billing practices. The court said that in its view,
"professional services" ... embrace those activities that distinguish a particular occupation from other occupationsas evidenced by the need for specialized learning or trainingand from the ordinary activities of life and business.
....
[O]ur view [is] that the billing is most sensibly seen as either a separate service provided by Medical Records for the hospitals or, as the district court found, an incidental part of the businessbut not the professionof medical records processing. As in most other businesses, the bill is an effect of the service provided, not part of the service itself.

[Id. at 515-16.]
Recently, the Appeals Court of Massachusetts came to a similar conclusion in Reliance National Insurance Co. v. Sears, Roebuck & Co., 58 Mass.App.Ct. 645, 792 N.E.2d 145 (2003). Daniel Goldstone was a Massachusetts attorney who was sued by Sears for fraudulent billing practices. Goldstone had a professional liability insurance policy issued by Reliance, but it declined coverage in the lawsuit filed by Sears. In finding for Reliance, the court said,
[T]he billing function of a lawyer is not a professional service. Billing for legal services does not draw on special learning acquired through rigorous intellectual training.... The billing function is largely ministerial. There are elements of experience and judgment in billing for legal services, but the same goes for pricing shoes.
[Id. at 648, 792 N.E.2d 145.][2]
*924 The parties' research, as well as our own, has turned up two federal district court decisions which considered related issues but reached differing conclusions, Princeton Insurance Co. v. Kosoy, 1999 WL 79055 (E.D.Pa.1999), aff'd without opinion, 281 F.3d 223 (3d Cir.2001), and Matrix Health Management v. Western World Insurance Co., 1993 WL 276842 (E.D.Pa.1993), aff'd, 1994 WL 378986 (3d Cir.1994). Defendant Kosoy was a chiropractor who rendered treatment for a period of time to John Seltzer. After the treatment ceased, Kosoy continued to send bills to Liberty Mutual Insurance Company for services he had not performed and the bills were routinely paid. Seltzer later began suit against Kosoy, claiming that as a result of Kosoy's improper billing, he had been denied workers' compensation benefits. Princeton had issued a professional liability policy to Kosoy but it refused to provide a defense or indemnification to Seltzer's suit and it began a declaratory judgment action. The district court granted Princeton's motion for summary judgment, saying "[t]he Seltzer complaint alleges claims for negligence, fraud and breach of contract arising solely out of the billing practices of Dr. Kosoy's chiropractic business. There is no claim that conceivably could be deemed to be a `medical incident' as that term is defined in the policy." Id. at *3.
In Matrix, on the other hand, plaintiff was sued by Travelers Insurance Company and the Railroad Employees National Health and Welfare Plan based upon an alleged fraudulent billing scheme to collect money for in-patient psychiatric services that were unnecessary and other health care services which were not rendered. Matrix had a professional liability policy with Western World, which refused to provide a defense to the underlying action. Matrix then brought its declaratory judgment action. The Court of Appeals affirmed the District Court's finding that Western was obligated to provide a defense to Matrix. It noted that the underlying complaint referred to "other violations of the Plan," which could be interpreted to include allegations of negligence, which would trigger the duty to defend.
One other Third Circuit case must be noted, Visiting Nurse Association v. St. Paul Fire & Marine Ins. Co., 65 F.3d 1097 (3d Cir.1995). Visiting Nurse Service had both professional liability and comprehensive general liability insurance policies issued by St. Paul. It was sued by a competitor, American Health Systems, Inc., under various theories, including antitrust and RICO claims. Visiting Nurse Service sought coverage under both St. Paul policies. The trial court found that St. Paul was obligated to defend under the professional liability policy and St. Paul appealed. The Court of Appeals reversed, relying on the distinction between professional and commercial activities described in Harad. The court noted that the allegations against Visiting Nurse Service "stem[med] from [its] effort to operate its business, not from any professional services that were or should have been provided by the discharge planners, and thus do not even potentially fall within the policy's coverage." Id. at 1102.
We consider the distinction recognized by the Third Circuit in Harad; Visiting Nurse Association and Kosoy between professional and commercial activities to be entirely valid. The conduct at issue in the Blue Cross/Blue Shield litigation related entirely to plaintiffs' commercial activities running their business enterprises and did not involve a medical incident.
It is important to recognize what is at issue in the Blue Cross/Blue Shield litigation. Blue Cross/Blue Shield is seeking reimbursement from parties it alleges did *925 not comply with the terms of the service provider agreements they had with Blue Cross/Blue Shield. There is no claim asserted there on behalf of a patient alleging that the patient was injured as a result of receiving psychiatric care that did not comply with the appropriate standard of care. Such a claim would arise out of a rendering or failure to render professional services and would fall within the coverage terms of these policies.
We have concluded that the billing practices of plaintiffs, which are at the heart of the Blue Cross/Blue Shield litigation, do not constitute professional services and any liability which may be imposed upon plaintiffs in that litigation cannot be considered the result of a medical incident arising out of supplying or failing to supply professional services. Accordingly, Princeton and MIIX have no obligation to provide a defense to plaintiffs in the Blue Cross/Blue Shield litigation. The order under review is reversed.
NOTES
[1] Plaintiffs also joined as defendants Travelers Insurance Company, Fireman's Fund Insurance Company and Atlantic Mutual Insurance Company, all of which had issued comprehensive general liability policies to plaintiffs. The trial court granted those insurers summary judgment, holding that economic loss did not constitute property damage and that the claim for reimbursement did not arise out of an "occurrence" as defined within those policies. Plaintiffs did not seek leave to appeal from that determination.
[2] The court recognized in a footnote that certain aspects of billing for legal services might entail specialized knowledge or skill if it were structured to account for tax consequences. We do not consider that limitation to detract from the validity of the court's holding or its applicability here.